In re Interest of M.R., J.R., and N.R., children under 18 years of age.
State of Nebraska, appellee, v. T.R., appellant.
420 N.W.2d 924

Filed March 25, 1988.   No. 87-552.

Mark D. McGuire of Crosby, Guenzel, Davis, Kessner & Kuester, for appellant.

48

Michael G. Heavican, Lancaster County Attorney, and Janice Lipovsky, and Roger Lott, guardian ad litem, for appellee.

BOSLAUGH, CAPORALE, SHANAHAN, and GRANT, JJ., and BURKHARD, D.J.

CAPORALE, J.

T.R., who was 24 years old at the time of trial, appeals from the judgment of the separate juvenile court of Lancaster County, terminating her parental rights in and to her daughter, M.R., born February 24, 1980, and her two sons, J.R., born April 7, 1981, and N.R., born April 29, 1983. W.R., the adoptive father of M.R. and husband of T.R. at the time of the births of J.R. and N.R., relinquished his parental rights to all of the children, which rights were then terminated by the court below. Since he has not appealed from that judgment, we are concerned only with the rights of the mother, who contends the court below erred in determining that the evidence clearly and convincingly established that (1) she had "substantially and continuously neglected" her children or refused to provide them with "necessary parental care and protection," (2) she had failed to reasonably comply with a plan of rehabilitation, and (3) it was in the children's best interests to terminate her parental rights. We affirm.

It is our obligation to try the factual questions de novo on the record, and we are thus required to reach a conclusion independent of the trial court; however, where the evidence is in conflict, we consider and may give weight to the trial court's observation of the witnesses and acceptance of one version of the facts rather than another. *In re Interest of L.H.*, 227 Neb. 857, 420 N.W.2d 318 (1988); *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).

T.R. and W.R. were married in 1980; an action to dissolve their union was filed in 1983, during which a battle over the custody of the children developed. Remarkably enough, however, when the marriage was dissolved, legal custody of the children was placed jointly in and with the two parents. Each parent was to have physical possession of the children during alternate 2-week periods. Predictably, the arrangement did not

work. According to the mother, who lived alone for a period after the dissolution, the father harassed and intimidated her whenever she had physical possession of the children. She claims to have lived in fear that he would harm both her and the children. There is evidence that the father is a violent individual who had assaulted the mother and threatened both her and her family over custody issues.

The mother, on her own, asked for help from the Department of Social Services because she could not control the children after they visited their father. The mother then moved in with a friend, and shortly thereafter, the father filed a complaint with the police, alleging that the mother and her friend were engaging in inappropriate sexual conduct. An investigation of the complaint revealed that the father had sexually molested his adopted daughter. In addition, the amended petition filed by the State alleged that the mother's friend had had sexual contact with M.R. and J.R. and that M.R. and J.R. had been locked in a closet.

After the children were placed in emergency foster care on or about December 17, 1984, an adjudication hearing was had, at which the juvenile court found the children to be subject to its jurisdiction under the provisions of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1984). That statute provides that the juvenile court shall have original and exclusive jurisdiction over

> (3) Any juvenile (a) who is homeless or destitute, or without proper support through no fault of his or her parent, guardian, or custodian; who is abandoned by his or her parent, guardian, or custodian; who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian; whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juvenile; whose parent, guardian, or custodian neglects or refuses to provide special care made necessary by the mental condition of the juvenile; or who is in a situation or engages in an occupation dangerous to life or limb or injurious to the health or morals of such juvenile . . . .

The evidence on which that adjudication was made is not

contained in the bill of exceptions submitted to us, and we must thus conclude that the evidence supports the assertion of jurisdiction by the juvenile court. We therefore concern ourselves only with whether the evidence clearly and convincingly establishes the State's right to terminate the mother's parental rights within the context of the errors she has assigned to the termination phase of the proceeding, the only phase covered by the bill of exceptions.

According to the transcript, the court ordered a plan designed to reunite the mother with her children by requiring her to participate in counseling with an approved therapist, obtain parental training, visit her children on a regular basis, and establish a residence separate and apart from her friend.

The mother maintained consistent visitation with her children up until December 1985, when she became frustrated with the social services system and refused any more visitations, except for an unscheduled one at a holiday dinner. However, up to the time she ended her visitation, the mother interacted well with the children and was attentive and interested in their well-being. She also stopped the counseling she had been undergoing because she felt she did not interact well with the counselor to whom she had been reassigned. Moreover, the mother continually refused to establish a residence separate and apart from her friend.

Thus, on February 25, 1987, the State filed a petition seeking a termination of the mother's parental rights, pursuant to Neb. Rev. Stat. § 43-292 (Reissue 1984), which provides:

> The court may terminate all parental rights between the parents . . . and such juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:
>
> . . . .
>
> (2) The parents have substantially and continuously or repeatedly neglected the juvenile and refused to give the juvenile necessary parental care and protection;
>
> . . . .
>
> (6) Following a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247,

reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination.

At the termination hearing a foster care provider testified that when M.R. became depressed and unhappy, she would run to her room, crawl under her blankets, and masturbate as she said she had been taught to do by her mother's live-in friend. There was also testimony that M.R. and J.R. talked about seeing sexual activities between her mother and the live-in friend and that J.R. had spoken of being locked in a room with no doorknob.

The mother asserted, however, that the children were not speaking of the friend with whom she lived, but adduced no evidence to corroborate her assertion. The mother testified she did not wish to establish an independent residence because she was afraid of the children's father, and, though still frightened, living with her friend made her feel safer. She admitted, however, that at one time she claimed she lived with her friend because she had been evicted from her apartment and had no money. At the time of the termination hearing, the mother was employed and earning $4 per hour.

There was testimony that M.R. had low self-esteem and scratched or dug at herself until sores developed; that J.R. is an extremely disruptive and aggressive child, prone to hitting, biting, and kicking adults and children alike; and that two foster care providers found the children so unmanageable as to ask that they be placed elsewhere. There was expert testimony that the children need a stable home environment, as demonstrated by the fact that when J.R. was given several hours of daily undivided attention, his behavior improved.

Whatever may be the merits of other aspects of the court's rehabilitative plan, and whatever may be the rights of adult lovers, no one has the right to corrupt innocent children, as the evidence clearly and convincingly establishes was done in this case as a consequence of the mother's living arrangements. The mother cannot provide her children with a stable home environment while she lives with this particular person. Moreover, the evidence establishes the mother had but one visit with her children since December 1985. No matter how

frustrating dealing with the social services bureaucracy may be, such frustration provides no basis for forsaking one's children.

There was expert testimony that the mother had a passive-aggressive personality which is characterized by the alleviating of stressful situations by avoidance behavior, such as by skipping appointments. That may explain why the mother did not see her children, but it neither helps the children nor shows that the mother has taken steps or will ever take steps to put herself in a position to take proper care of her children. Neither did the mother's fear of the children's father excuse her failure to remove herself from the home of one who has mistreated her children. The court did not require that the mother live alone, only that she not live with a person who was a demonstrated danger to her children.

As we observed in *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987), a juvenile court may, under proper procedures and when warranted, order a rehabilitative plan with reasonable provisions material to the plan's rehabilitative objective of correcting, eliminating, or ameliorating the condition or situation on the basis of which the juvenile court asserted jurisdiction.

> Materiality of a provision in a court-ordered rehabilitative plan is determined by a cause-and-effect relationship: Does a provision in the plan tend to correct, eliminate, or ameliorate the situation or condition on which the adjudication has been obtained under the Nebraska Juvenile Code? An affirmative answer to the preceding question provides the materiality necessary in a rehabilitative plan for a parent involved in proceedings within a juvenile court's jurisdiction. Otherwise, a court-ordered plan, ostensibly rehabilitative of the conditions leading to an adjudication under the Nebraska Juvenile Code, is nothing more than a plan for the sake of a plan, devoid of corrective and remedial measures. Similar to other areas of law, reasonableness of a rehabilitative plan for a parent depends on the circumstances in a particular case and, therefore, is examined on a case-by-case basis.

*Id.* at 268, 417 N.W.2d at 158.

The plan in question was material because it provided a

means to change the conditions under which the mother lived, conditions which had proved to be deleterious to the best interests of the children. The mother simply chose her friend over her children.

As we have said before, where parents are unable or unwilling to rehabilitate themselves within a reasonable time, the best interests of the children require that parental rights be terminated without delay. *In re Interest of Z.R.*, 226 Neb. 770, 415 N.W.2d 128 (1987); *In re Interest of P.J.M., R.E.M., and S.A.M.*, 226 Neb. 764, 415 N.W.2d 124 (1987). The condition which required the children's placement in emergency foster care continues to exist some 2 ½ years later.

There being no merit to any of the mother's assigned errors, the judgment terminating her parental rights in and to M.R., J.R., and N.R. is affirmed.

AFFIRMED.