IN RE INTEREST OF L.H., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. M.H., APPELLANT.
420 N.W.2d 318

Filed March 18, 1988.    No. 87-375.

Edward F. Noethe of Sodoro, Daly & Sodoro, for appellant.

Ronald L. Staskiewicz, Douglas County Attorney, and Maria R. Leslie, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

PER CURIAM.

M.H. appeals from an order of the separate juvenile court of Douglas County, which terminated M.H.'s parental rights in her daughter, L.H., as the result of the mother's failure to correct conditions leading to adjudication that L.H. was a juvenile within the Nebraska Juvenile Code, Neb. Rev. Stat. §§ 43-245 et seq. (Reissue 1984 & Cum. Supp. 1986).

> "In an appeal from a judgment terminating parental rights, the Supreme Court tries factual questions de novo on the record, which requires the Supreme Court to reach a conclusion independent of the findings of the trial court, but, where evidence is in conflict, the Supreme Court considers and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts rather than another."

*In re Interest of J.S., A.C., and C.S.,* ante p. 251, 256, 417 N.W.2d 147, 152 (1987) (quoting *In re Interest of T.C.,* 226 Neb. 116, 409 N.W.2d 607 (1987)).

On February 9, 1984, the State petitioned the juvenile court, claiming that the child, L.H., lacked proper parental care by reason of the faults and habits of her mother and was, therefore, a juvenile within § 43-247(3)(a) (Reissue 1984) of the Nebraska Juvenile Code. Specifically, the State alleged that M.H. had failed to provide L.H. with a suitable home, had left the child for prolonged periods with M.H.'s friends, and had failed to provide L.H. with parental supervision, protection, and care.

A preadjudication detention hearing established that the mother and child lived either in a foster home or with three friends in a one-bedroom apartment. During that time, the child received a cigarette burn, had severe diaper rash, and suffered a second degree burn on her face when the mother was in another room and the child pulled a pot of hot water off the kitchen table. Also, glass from a shattering mirror cut L.H., requiring 36 stitches in her abdomen. The mirror, being used by the mother, fell and broke, sending flying glass into the child's body. On another occasion, L.H. accidentally burned herself with a hot iron, although the mother had warned the child not to touch the iron. At the conclusion of the hearing and for the urgent protection of L.H., the court placed temporary custody of the child with the Department of Social Services, pending the adjudication hearing scheduled for April 3, 1984. At the adjudication hearing, M.H. appeared with her lawyer and admitted the allegations in the State's petition. The court found that L.H. was a juvenile within the act, continued the child's custody in the Department of Social Services, and set the matter for a dispositional hearing on August 1, 1984. Evidence at the dispositional hearing again related to the incidents involving the burn from the iron and scalding of the child, as previously described in the preadjudication hearing. Evidence also pertained to M.H.'s continued unemployment, unsuitable housing, unstable lifestyle, and lack of supervision over the child, which was a contributing factor to L.H.'s physical injuries. The court ordered a rehabilitation plan, requiring that M.H. provide suitable housing for herself and the child, obtain employment, attend parenting classes, receive psychiatric and psychological evaluations arranged through the court, and

receive counseling. The court granted M.H. the right to visit L.H. Thereafter, between November 15, 1984, and January 16, 1987, the court held eight review hearings concerning M.H.'s compliance with the original rehabilitation plan and added new provisions in the light of circumstances arising after the initial plan ordered on August 1, 1984. As examples of supplemental or additional provisions to the initial plan, after a review hearing in July 1985, the court required that M.H. obtain suitable housing within 60 days, receive budget counseling, undergo a chemical dependency evaluation, and notify the court within 48 hours of any changed address of the mother's residence. After a further review hearing in October 1985, the court required M.H. to secure suitable housing within 30 days, notify the court before any change in her residence, supply rent receipts to M.H.'s probation officer, and exercise extended visitation of L.H. as arranged by a child protection worker.

In its petition to terminate parental rights, the State alleged that M.H. had failed to comply with the court-ordered rehabilitation plan, see § 43-292(6) (Reissue 1984), concerning M.H.'s employment, housing, rent receipts, changes of address, and visitation of L.H.

As required by the rehabilitation plan, M.H. had submitted to psychiatric and psychological examinations in which M.H. was diagnosed as an "easygoing and permissive" individual with a "normal young adult personality." However, the psychological report noted that M.H. is "undisciplined" and acts "without thinking of consequences."

M.H. frequently moved from one residence to another and lived in a variety of residences, ranging from a one-bedroom apartment with her boyfriend to her mother's home, where M.H. and her boyfriend lived in a bedroom with her brother or uncle. Although the caseworker continually admonished M.H. to obtain adequate housing, M.H. usually complained that she did not have the money for such housing. Over the 2 years during which the court conducted review hearings, the longest that M.H. remained in any one residence was 4 months. For most of the time throughout the periodic review hearings, M.H. lived at her mother's home, hotels, and at the homes of various relatives. When M.H. lived with her boyfriend, the couple

either lived at the home of another couple or in a one-bedroom apartment. M.H. consistently failed to notify anyone of her moves from one residence to another. Notwithstanding the court's requirement that M.H. find suitable housing within the time limits specified in the court's orders concerning housing, M.H. failed to acquire suitable housing. M.H. admitted that her transient lifestyle would not provide a stable and suitable environment for L.H. and that she had not provided a permanent and stable home for herself and L.H. independent of M.H.'s boyfriend.

Over the 2-year timeframe for the review hearings, M.H. had at least 10 part-time jobs which lasted for short periods. M.H.'s employment did not cover the basic costs for adequate and suitable housing for herself and L.H. M.H. was fired from a telemarketing job because she failed to make enough sales. M.H.'s only verification of her employment occurred in February and March of 1986, when she provided three pay stubs to her probation officer. Although the probation officer explained to M.H. that she must obtain stable employment, M.H. failed to obtain steady employment. Between May 16, 1986, and the termination hearing, M.H. held three different jobs. Also, M.H. failed to comply with the court's order, contained in the rehabilitation plan, that M.H. receive budget counseling in view of her financial condition.

A counselor-therapist taught M.H. basic parenting techniques in child raising. Because of M.H.'s failure to consistently attend the parenting classes, the counselor considered discontinuing the sessions with M.H. M.H.'s attendance at counseling sessions and parenting classes was "sporadic."

M.H. frequently would confirm her expected visitation of L.H. at a foster home and then fail to keep the visitation. In these situations, L.H. would be brought to the visitation room, and, when M.H. did not arrive for visitation after a 30-minute wait, would be returned to the child's living quarters. Under those circumstances, L.H. became angry and frustrated as the result of M.H.'s failure to keep the visitation. On occasions when M.H. did visit the child, there were instances demonstrating a lack of concern for, or supervision over, the

child. For example, on one occasion, when the child asked for a drink of water, the mother gave the child a cup containing water and a metal screw. Other incidents evidenced M.H.'s lack of supervision over her child and lethargy toward the child during periods of visitation.

When L.H. was enrolled in the Head Start program, the child was referred to a family therapist in November 1986, because the child was "kicking, spitting, and throwing tantrums" around other children. L.H. refused to talk about M.H. and became agitated in conversations about her mother. According to the therapist, L.H. was confused and angry with her mother, especially because M.H. frequently missed planned visitations with the child. At the time of the termination hearing, L.H. considered her foster mother as her real mother.

In connection with the rehabilitation plan, M.H. was directed to Family Intensive Treatment Service (FITS) for a program which included budgeting, household management, parenting skills, and communication. M.H. was aware that, in connection with the FITS program, she was required to obtain housing independent from her boyfriend so that FITS personnel could work with her. M.H. failed to obtain such housing, and the FITS program was terminated. During this period, M.H. was moving back and forth between her relatives' homes.

After noting that L.H. had been in a foster home for an extended period of time (since January 1984) and that the court-directed reasonable efforts to correct M.H.'s problems were of no avail, the court found that it was in L.H.'s best interests that M.H.'s parental rights be terminated and that L.H. be placed in the custody of the Department of Social Services for the purpose of adoption.

M.H. contends that the evidence does not establish that she has failed to comply with the rehabilitation plan and thereby has failed to correct the conditions leading to the adjudication in these proceedings. Also, M.H. claims that the juvenile court erred in finding that the best interests of L.H. require termination of M.H.'s parental rights.

Section 43-292 provides in part:

> The court may terminate all parental rights between the

parents [and a] juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:

. . . .

(6) Following a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination.

A juvenile court has the discretionary power to prescribe a reasonable plan for parental rehabilitation to correct the conditions underlying the adjudication that a child is a juvenile within the Nebraska Juvenile Code. *In re Interest of T.C.*, 226 Neb. 116, 409 N.W.2d 607 (1987). See, also, § 43-292 (termination of parental rights; failure to correct conditions leading to adjudication). When a parent fails to make reasonable efforts to comply with the court-ordered rehabilitative plan, the parent's failure presents an independent reason justifying termination of parental rights. *In re Interest of J.S., A.C., and C.S., ante* p. 251, 417 N.W.2d 147 (1987); *In re Interest of J.W.*, 224 Neb. 897, 402 N.W.2d 671 (1987); *In re Interest of L.J., J.J., and J.N.J.*, 220 Neb. 102, 368 N.W.2d 474 (1985). "When parents cannot rehabilitate themselves within a reasonable time, the best interests of a child require that a final disposition be made without delay." *In re Interest of W.*, 217 Neb. 325, 330, 348 N.W.2d 861, 865 (1984).

In the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code, Neb. Rev. Stat. §§ 43-245 to 43-2,129 (Cum. Supp. 1982 & Reissue 1984), termination of parental rights is permissible when the basis for such termination is proved by clear and convincing evidence.

*In re Interest of T.C., supra* at 117, 409 N.W.2d at 609. "A juvenile's best interests are the primary considerations in determining whether parental rights should be terminated as authorized by the Nebraska Juvenile Code." *In re Interest of J.S., A.C., and C.S., supra* at 267, 417 N.W.2d at 158.

In *In re Interest of J.S., A.C., and C.S., supra*, we expressed

the following regarding termination of parental rights under § 43-292(6) of the Nebraska Juvenile Code:

[I]f a circumstance designated in subsections (1) to (6) is evidentially established, there must be the additional showing that termination of parental rights is in the best interests of the child, the primary consideration in any question concerning termination of parental rights. The standard of proof for each of the two preceding requirements prescribed by § 43-292 is evidence which is "clear and convincing."

Therefore, regarding parental noncompliance with a court-ordered rehabilitative plan, under § 43-292(6) as a ground for termination of parental rights, the State must prove by clear and convincing evidence that (1) the parent has willfully failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the plan and (2) in addition to the parent's noncompliance with the rehabilitative plan, termination of parental rights is in the best interests of the child.

*Ante* p. 267, 417 N.W.2d at 158.

In *In re Interest of D.*, 218 Neb. 23, 29, 352 N.W.2d 566, 570 (1984), this court expressed:

" ' "[W]e will not gamble with the child's future." ' " In our system of law directed toward the best interests of a juvenile, termination of parental rights is not a penalty imposed on account of poverty. Parental inability to reach heights of economic success is no basis to sever the precious relationship which normally exists between parent and child. However, that same system of laws pertaining to juveniles cannot reward parental bankruptcy evidenced by indifference or inexcusable lethargy adversely affecting the life and living conditions demanded by a child's personal dignity.

The evidence in the present case establishes that M.H. has, at best, sporadically complied with the rehabilitation plan ordered by the court. M.H.'s lethargic attitude toward her child, in addition to her complete failure to obtain suitable housing and stable employment, has psychologically harmed the child. As the family therapist testified, the child becomes extremely

angry and confused because of M.H.'s infrequent visitations and frequent failure to keep the visitation appointments. Furthermore, M.H.'s failure to obtain counseling and attend parenting classes has not corrected a condition, that is, M.H.'s lack of supervision over the child, which led to the adjudication that L.H. is a neglected child. Finally, the record of the numerous review hearings held by the juvenile court contains a sufficient basis for concluding that the State has adduced clear and convincing evidence that (1) M.H. has willfully failed to comply with the numerous provisions in the rehabilitation plans ordered by the court and (2) termination of parental rights is in the best interests of the child. L.H. should not be confined in indeterminate foster care and has already waited over 3 years for her mother to correct the situation which led to the adjudication in this case. As this court has repeatedly stated: "[A] child cannot, and should not, be suspended in foster care, nor be made to await uncertain parental maturity." *In re Interest of Z.R.*, 226 Neb. 770, 786, 415 N.W.2d 128, 138 (1987). Therefore, we find clear and convincing evidence that M.H. has willfully failed to comply with the rehabilitative program ordered by the juvenile court to correct the conditions underlying the adjudication that L.H. is a juvenile within the Nebraska Juvenile Code and that termination of parental rights is in the best interests of L.H. The juvenile court's judgment, terminating M.H.'s parental rights in L.H., is affirmed.

AFFIRMED.